**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| MARIA ARGUETA, ET AL., | : | |
| | : | Civil Action No.  08-1652 (PGS) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| U.S. IMMIGRATION AND | : | |
| CUSTOMS ENFORCEMENT, ET AL., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

SHERIDAN, U.S.D.J.

This matter comes before the Court on Defendants', United States Immigration and Customs Enforcement (ICE), et al., motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (2) and (6).  The motion requests dismissal of certain claims on five separate grounds.  Dismissal of all claims is sought by the four named "Supervisory Defendants" only.  They are (i) Julie Myers, in her prior capacity as the Assistant Secretary for Homeland Security for ICE in Washington, D.C. at all relevant times prior to November 15, 2008; (ii) John Torres, Acting Deputy Assistant Secretary for Operations of ICE, and at all relevant times prior to March 5, 2008, the Director (or Acting Director) of the ICE Office of Detention and Removal Operations (DRO) in Washington, D.C.; (iii) Scott Weber, Director of the DRO Field Office in Newark, and (iv) Bartolome Rodriguez, former Acting Field Office Director for the DRO Field Office in Newark. [1]

---

[1] There are a number of police officers, ICE agents and other officers who have not been identified because Plaintiffs require discovery in order to identify these Defendants.  The motion does not involve those officers.

The five different grounds on which Defendants bring this motion to dismiss are (1) this Court lacks jurisdiction over anonymous Plaintiffs who have filed under the Roe pseudonym; (2) under the Immigration and Nationality Act, specifically 8 U.S.C. §§ 1252(b)(9) and 1252(g), this Court lacks subject matter jurisdiction over claims arising from any actions taken to remove an alien; (3) Plaintiffs seek an extension of *Bivens*[2] beyond the present scope of the case law; (4) this Court lacks personal jurisdiction over the two Supervisory Defendants residing in Washington, D.C. (Myers and Torres); and (5) all Supervisory Defendants have qualified immunity.  The government at this juncture does not move to dismiss as to the individual, non-supervisory ICE agents involved in the matters.

For the reasons set forth below, this Court:

(1) Dismisses all claims brought by the anonymous Plaintiffs subject to these Plaintiffs' right to amend their complaint to include their identity within three weeks;

(2) Denies Defendants' motion to dismiss claims for lack of subject matter jurisdiction brought by the remaining Plaintiffs who may be subject to removal;

(3) Denies Defendants' motion to dismiss *Bivens* claims brought by Plaintiffs believed to be unlawful aliens;

(4) Denies Defendants' motion to dismiss claims against the Washington, D.C.-based Supervisory Defendants, Myers and Torres, for lack of personal jurisdiction; and

(5) Denies Defendants' motion to dismiss claims on the ground of qualified immunity against the four Supervisory Defendants, Myers, Torres, Weber, and Rodriguez, but will, for now, limit discovery of these Defendants to interrogatories and a deposition each, after which the parties may re-argue the issue of these Defendants' qualified immunity.

---

[2]        *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

I.

*Statement of Facts*

This is a suit by thirteen Plaintiffs, eight of whom have been identified by name in the First Amended Complaint (FAC), while the remainder seek to proceed anonymously due to an alleged fear of retaliation.  The claims of each plaintiff are strikingly similar. In each case, Plaintiffs allege that ICE agents entered their home in the early morning hours without appropriate consent and/or warrants. The gravamen of the FAC is that the ICE agents searched the homes and arrested individuals within the homes in violation of their constitutional rights[3].

The Plaintiffs contend that the Department of Homeland Security (Department or DHS) instituted a program known as "Operation Return to Sender" (ORTS) which "exponentially increased quotas for the arrest of immigrants" through the use of these pre-dawn "raids."  More importantly, Plaintiffs allege that the Supervisory Defendants, despite knowledge of the "unconstitutional and abusive conduct" allowed the ORTS program to continue unabated.  More specifically, the Plaintiffs maintain that these Supervisory Defendants should have "develop[ed] meaningful guidelines or oversight mechanisms . . . provide[d] . . . adequate training . . . or otherwise ensured accountability" that ORTS operated within constitutional confines.  With this brief background, the alleged facts of each incident are discussed below.

<u>Maria Argueta</u>

At 4:30 a.m. on January 29, 2008, Maria Argueta was asleep in her home on the ground floor of a multi-unit apartment in a building in North Bergen, New Jersey.  Since 2001, she has had Temporary Protection Status (TPS), allowing her to lawfully remain in the United States.

---

[3]     The ICE agents had an administrative arrest warrant which did not authorize entry into a residence. (See Opinion at 19).

On the morning in question, Argueta was awakened by very loud banging on the front door and windows.  The banging was so loud that Argueta became frightened and did not open the door.

At the time, other tenants opened their doors to find out what the commotion was about. These tenants were confronted by ICE agents. The agents identified themselves as police (rather than ICE agents) and claimed they were looking for a criminal.

One tenant telephoned the landlord, who was Argueta's brother, and in turn handed the telephone over to an ICE agent. The agents advised Argueta's brother that they were searching for a male criminal, and they needed to search the ground floor apartment. Argueta's brother called Argueta and told her that police officers wanted to search her apartment for a male criminal.

After this call, Argueta opened the front door. The agents wore vests with the word "police" printed on them and visibly displayed holstered firearms. The ICE agents entered Argueta's apartment without voluntary informed consent and without a valid judicial warrant. Once inside, the agents claimed they were looking for a particular man. Argueta indicated that she did not know that man and no man had lived in the apartment for at least seven years.   The ICE agents searched Argueta's entire apartment, including closets and underneath beds.

Thereafter, one of the ICE agents asked Argueta about her immigration status. Argueta explained that she had been granted TPS and was awaiting a new TPS card to arrive in the mail. Argueta's TPS status was easily verifiable in the publicly-accessible United States Citizenship and Immigration Service database.

Thereafter, an ICE agent asked Argueta for identification. She presented her Salvadoran passport, which the agents confiscated. Subsequently, the ICE agents arrested Argueta. While in custody, ICE agents taunted Argueta about prison conditions, including the dangers of sexual

attack, refused to allow her to contact her attorney, handcuffed her, scorned and humiliated her, and did not feed her for more than 24 hours. She was finally released after 36 hours.

<u>Walter Chavez, Ana Galindo, and W.C.</u>

Walter Chavez and Ana Galindo are lawful permanent residents who reside in Paterson and have lived in the United States for approximately 28 years. Their nine-year-old son, W.C., is a United States citizen.

On April 2, 2008, at approximately 7:15 am, Chavez was returning to his home when six unmarked vehicles converged on his house. Two ICE agents approached Chavez's vehicle. One agent grabbed Chavez by the shirt collar, pulling him out of the car.  Without identifying themselves, and while pushing Chavez, the agents demanded to see Galindo.  One of the ICE agents threatened Chavez stating, "If you don't open the door, we're going to make things worse." As Chavez opened the door, at least seven ICE agents entered the house.  Although they wore jackets with ICE clearly printed on them, none of the agents identified themselves. The agents did not possess a valid judicial warrant.

As Chavez entered the premises, he called out to Galindo who was in the shower. Galindo put a shirt on but "was not properly dressed."  Thereafter, one  ICE agent screamed at Galindo, "Where are the illegal people?" Another agent repeatedly hollered the same question at Chavez.  Another agent warned, "It's illegal to be hiding illegals. If you don't tell me where they are, things will get worse. If you don't tell me where they are, we'll arrest you." Simultaneously, a female agent questioned Galindo about her sisters. Based upon Galindo's reply, the agent acknowledged that Galindo was not the person the agents were seeking to arrest.

Having heard the commotion, W.C. ran to his mother, crying. As he did, four of the ICE agents opened their jackets and displayed their guns and placed their hands on their firearms.

One armed agent pointed his gun at her and W.C. The child, W.C., was terrorized. In front of W.C., an agent said to Galindo, "If you're hiding illegal people here, we're going to take your son and your residency away."

Upon request, Galindo produced identification, including her New Jersey driver's license, as well as her and Chavez's green cards and her son's United States passport. Throughout the search, the agents rummaged through family photos and other personal items. Before leaving, one of the agents directly announced, "We're going to come back. And next time it will be worse."  W.C. was severely traumatized by the raid.

Arturo Flores and Bybyana Arias

Plaintiffs Arturo Flores and his stepdaughter Bybyana Arias are both United States citizens.

On the morning of November 13, 2006 at 3:00 a.m.,  Flores, his wife, and his wife's teenage daughter Arias were asleep in their home in Clifton. As in the other instances, Flores was awakened by loud banging on his front door and the sound of his doorbell ringing incessantly. As he approached the door, Flores observed four law enforcement officers through the window.

As Flores cracked the front door slightly, the agents forced the door open, shoving Flores out of the way, and entered the home without his consent. The agents did not possess a valid judicial warrant.  ICE agents searched every room of Flores's home.

A female ICE agent entered Bybyana's bedroom ordering her out of bed and into a common area where she was detained in her nightclothes along with Flores's wife.

ICE agents intimidated them while there by displaying their holstered firearms and at certain points placing their hands on their holstered guns, suggesting they were preparing to brandish their weapons.

The agents interrogated Flores, and upon demand, he  produced identification. After the search of the home, the agents arrested Flores's wife and brother.  Arias is distraught over this incident.

Juan Ontaneda

On the morning of December 7, 2007, plaintiff Juan Ontaneda was living in a multi-family home in Newark with a family (father, mother, grandfather, and three children).[4]

Around 5:30 to 6:00 a.m., Ontaneda was startled by pounding on his front door. Thinking the person knocking might be another tenant who was locked out, Ontaneda opened the door. He was confronted by six armed  ICE agents wearing jackets bearing the acronym "ICE."

Without identifying themselves, one or more of the ICE agents showed Ontaneda a picture of an individual named "Elias."   Ontaneda denied knowing Elias, but the agents prevented him from closing the door.

At this time, the owner of the dwelling appeared and after speaking with the agents, the landlord told Ontaneda to get the grandfather. When Ontaneda returned he discovered that the ICE agents had entered the apartment behind him.  The ICE agents entered without a judicial warrant and without his consent. At that time, the ICE agents interrogated the grandfather and Ontaneda about their immigration status.

Upon demand, Ontaneda produced identification.  He overheard the agents contact other ICE personnel by telephone to inquire whether there was an outstanding deportation order for

---

[4]        It is uncertain whether Ontaneda is related to the family.

Ontaneda. There was no such order. In addition, one agent suggested that Ontaneda should not be arrested, but this was overruled, at which point Ontaneda's hands, ankles and feet were cuffed, and Agents transported Ontaneda to a detention facility in Elizabeth, New Jersey.

Veronica Covias

Veronica Covias is a lawful permanent resident of the United States who lived with her husband and son in a two-story home in Paterson.

At approximately 4:00 a.m. on March 26, 2007, the family awoke to loud pounding on their front door and shouts of "Paterson Police."  Covias went to the door and opened it a crack, thinking that there was an emergency. At that moment, she observed several ICE agents, and she inquired what they wanted.  Covias asked if they had a warrant. The agents did not answer, but insisted that they "just want[ed] to talk to her."  Before Covias could respond, one ICE agent inserted his foot in the doorway and pushed the door open, forcing his way into the home. Covias did not give her consent to this entry. The agents did not possess a judicial warrant.

About five ICE agents entered into the home, displaying batons. While keeping Covias on the first floor, other agents proceeded upstairs. Immediately thereafter, Covias's son, shackled in handcuffs and leg irons, was escorted down the stairs by the agents.

Although she begged to know why the agents were arresting her son, the agents did not answer.  She pleaded to hug her son, but the agents pushed her aside.  After being held in solitary confinement for approximately three days in Georgia, Covias's son was deported.

Anonymous Plaintiffs

Among the Plaintiffs, there are five who seek to proceed anonymously.  They are Carla Roe 1 of Latino origin residing in Hudson County, Carla Roe 2 of Latino origin and a  resident of Morris County, Carlos Roe 2 of Latino origin residing in Morris County, Carla Roe 3 of

8

Latino origin residing in Salem County, and Carlos Roe 4 of Russian origin and residing in Passaic County (hereinafter collectively referred to as the Roe Plaintiffs).

The allegations of each Roe Plaintiff are set forth below.

<u>Carla Roe 1</u>

In August 2007, at about 6:30 a.m., Carla Roe 1 was at home with her husband and their two young children, both of whom are United States citizens. At that time, she was startled by loud knocking at their front door. Her husband cracked open the front door slightly when he was confronted by three ICE agents.

According to Carla Roe 1, the agents failed to identify themselves, but they stated that they were looking for a person who sold drugs and asked to enter the home. Suddenly, the agents burst through the door and entered the home without plaintiff's husband's consent. The officers did not possess a valid search or arrest warrant. As Carla Roe 1 came downstairs and upon seeing the agents, she declared that the agents did not have permission to enter her home. In reply, one of the agents falsely indicated that her husband consented. Carla Roe 1 requested that the agents speak quietly to avoid waking her two children; the agents replied that they "didn't care about the kids" and that they would do as they pleased. Carla Roe 1 was asked to provide identification, but she could not produce any. Carla Roe 1 attempted to call an attorney, but the ICE agents physically prohibited her from making a phone call. Because Carla Roe 1 lacked identification, she was taken into custody. Meanwhile, the agents searched the entire ground floor of the home. Thereafter, Carla Roe 1 was transported to the Hudson County Correctional Center. While there, Carla Roe 1 asked to consult her attorney, but the request was denied. After being detained for approximately two and one-half months, Carla Roe 1 was deported to Mexico.

<u>Carla Roe 2 and Carlos Roe 2</u>

Carla Roe 2 and her son, Carlos Roe 2, lived with several other individuals in a three-story home in Morris County.

In June 2007, at approximately 6:45 a.m., Carla Roe 2 heard loud banging on the front door. As she opened the door, ICE agents, with weapons drawn, forced their way into the home pushing Carla Roe 2 outside. The agents entered the home without Carla Roe 2's consent. They lacked a judicial warrant.  As Carla Roe 2 re-entered her home, the agents grabbed her, pulled her up the stairs, and then pushed her down onto a couch. Some agents proceeded to the third floor while another agent guarded Carla Roe 2 on the second floor.

 On the third floor, the agents found Carlos Roe 2, a high school student, coming out of the bathroom in his underwear. Without any knowledge of his status, the agents grabbed him and handcuffed him. One agent pointed his handgun at Carlos Roe 2.

During this search and seizure, the phone rang. One of the agents looked at the "caller ID" and asked Carla Roe 2 about the caller whose name appeared on the phone display; Carla Roe 2 did not respond. The agent then allegedly wrote down every name and number recorded in the "caller ID" function of Carla Roe 2's home phone. At some point Carla Roe 2 attempted to call a family member. When the agents realized same, one agent grabbed the phone from her and forcefully pulled it out of the wall and hid it in the refrigerator.

By this time, Carlos Roe 2 was outside in an unmarked vehicle being transported to a police station, where agents questioned him and asked him to identify certain individuals. At no point was he read his rights or advised that he could speak to an attorney.  The agents repeatedly asked Carlos Roe 2 if he was a gang member or sold drugs, or both. He denied same. Thereafter Carlos Roe 2 was taken to ICE Headquarters in Newark for six hours and then brought before a

judge, who set bond at $20,000.[5]   He was detained in a facility in Hudson County for two months.

Carla Roe 3

Sometime in August 2006 at approximately 3:00 a.m., Carla Roe 3,  her husband, and her three children were awakened by loud knocking on their door. The individuals outside repeatedly yelled, "Open the front door."  Carla Roe 3 responded, "No."

 Eventually, Carla Roe 3's husband opened the door.  Carla Roe 3 saw the ICE agents and members of  the Penns Grove Police Department, all of whom were wearing bullet-proof vests and carrying guns. More specifically, Carla Roe 3 recognized the female Spanish-speaking Penns Grove police officer. In addition, Carla Roe 3's husband recognized a black male Penns Grove  police officer.  ICE agents told Carla Roe 3's husband that they were looking for his brother-in-law. Without waiting for a response, the agents shoved him up the stairs and into the kitchen counter. They also pushed Carla Roe 3 out of the way. All the agents and officers had their weapons drawn as they entered the home. Neither Carla Roe 3 nor her husband gave consent to the agents and officers to enter their home.

Once inside an agent handcuffed the husband and again inquired about Carla Roe 3's brother. The husband replied that he had been deported two to three years earlier.[6] An ICE agent called for back-up, and at least another twelve John Doe ICE agents came into the home while others remained outside.  The agents detained Carla Roe 3 on the couch.  At the time,  Carla Roe 3 and her husband denied having any weapons or drugs.  The agents proceeded to search the entire home without consent. Brandishing their weapons, the agents awoke and handcuffed

---

        [5]        No reason for the bond was alleged.
        [6]        According to Carla Roe 3, a minimal review of DHS records would have revealed this deportation.

several of Carla Roe 3's relatives and brought them into the common area.  Against her pleas, the agents awoke Carla Roe 3's children and searched their rooms.  When Carla Roe 3 tried to ask the agents questions, they refused to answer, and screamed "Shut up" at her and at other occupants of the house.

The ICE agents confiscated Carla Roe 3's Mexican passport.  One agent threatened Carla Roe 3 that if she did not cooperate, she would be deported to Mexico and that her children would be taken from her. Another agent stated that he was on a "personal mission" to ensure her husband was jailed for 22 years for entering the country illegally.  The agents arrested her husband and two other occupants of the house, all of whom were subsequently deported.

### Carlos Roe 4

At approximately 5:30 a.m. in September 2007, Carlos Roe 4, who is married to a United States citizen, heard knocking on the front door of his two-bedroom apartment in Passaic County.

Carlos Roe 4's friend, who was temporarily visiting for a week, opened the door and was confronted by two ICE agents. Suddenly, there were nine agents at the door. One agent forced the door open and barred anyone from exiting the apartment.  One ICE agent stated that they were looking for an individual named Jose Morales, who had been fraudulently using Carlos Roe 4's mailing address. The agent showed Carlos Roe 4 a hand-drawn picture of a man, sketched on plain paper, which looked to Carlos Roe 4 like a child's drawing.  At that time, Carlos Roe 4 advised the agents that he lived in his apartment for seven years and had never seen any mail for Jose Morales and did not know him.

Without consent and without a judicial warrant, the agents entered and searched the home. They displayed their guns.  Carlos Roe 4 was frightened because he was not free to leave.

12

The agents confirmed that there was no outstanding deportation order on Carlos Roe 4. However, the agents arrested the friend, who remains detained at the Elizabeth immigration facility.  Two other agents searched through the friend's room and belongings, including inside drawers and suitcases as well as the rest of Carlos Roe 4's home. One female agent flipped through his books, and another rummaged through his mail.

Operation Return to Sender (ORTS)

In 2002, INS instituted a National Fugitive Operations Program.  About a year later, in the aftermath of 9/11, INS was subsumed into the Department, and the Department continued the Program.[7]  From 2002 onward, the number of fugitive aliens in the country rose rapidly. In 2006, there were 623,000 fugitive aliens.  In order to address this concern, the Department increased the number of Fugitive Operation Teams (FOTs) nationwide to fifty and dramatically increased the target numbers of arrests for each FOT.  In May 2006, the Department launched ORTS, which combined the resources of the prior program with those of other state and local law enforcement agencies in order to effectuate an "organized and methodical approach to the identification, location, and arrest of ICE fugitive aliens."[8]  As noted, ORTS focuses on fugitive aliens.  Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion, or have failed to report to a DRO [Office of Detention and Removal Operations] officer after receiving notice to do so."  (OIG Report at 2).

---

[7]     *See* Department of Homeland Security, Office of Inspector General, "An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams," OIG-07-34 (Mar. 2007), attached to FAC as Exhibit C (hereinafter referred to as OIG Report) at 1.

[8]     *See* Letter of Myers to Christina DeConcini of the Nat'l Immigration Forum, dated July 6, 2007, attached to FAC as Exhibit D (hereinafter Myers Letter).

13

Under ORTS, officials conduct their investigations by "focus[ing] their efforts on specific fugitive aliens at specific locations; that is, by prioritizing fugitive aliens by those who (1) are a threat to national security, (2) pose a threat to the community, (3) were convicted of violent crimes, (4) are convicted felons, and (5) are non-criminal fugitives". (Myers Letter at 2). The basic unit of enforcement is a FOT. In order to accomplish their goal of identifying, arresting, and removing fugitive aliens, "FOTs use leads and other intelligence based information." *Id.* at 1. Such information is "gathered through law enforcement channels," and once it locates several fugitives in the same vicinity, the FOT "develop[s] an operational plan for the swift and safe arrest of the fugitive aliens in the most fiscally efficient way." *Id.*

The arrest of fugitive aliens is tricky due to the nature of the warrant issued. The procedure to obtain a warrant for removal is straightforward. An order of removal is issued by an immigration judge after a hearing. Upon receiving such an order, DRO issues a Warrant of Deportation/Removal. *Id.* at 2. Since these warrants are administrative in nature, as opposed to judicial, officers must "obtain consent before they are permitted to enter private residences." *Id.* The Department recognizes that "warrants of removal do not grant the same authority to enter dwellings as a judicially approved search or arrest warrant." *Id.*

Ancillary to their authority to arrest based upon a warrant of removal is an ICE agent's authority to question any person about their immigration status. 8 C.F.R. § 287.5(a)(1). However, an officer may only detain an individual for further questioning if the officer has "reasonable suspicion that the individual has committed a crime, is an alien who is unlawfully present, is an alien with status who is either inadmissible or removable from the United States, or is a non-immigrant who is required to provide truthful information to DHS upon demand." (Myers Letter at 2) (citing 8 C.F.R. § 214.1(f)).

14

In order to obtain knowing and voluntarily consent from a dwelling's occupants, FOTs utilize interpreters during operations. According to their standard practices, the interpreter requests permission to enter a residence, and if so granted, agents enter and secure the premises in order to ensure officer safety. *Id.*

After the search and the arrest occurs, if any, and according to policy, the family members are provided a telephone number to call in order to locate the arrested.  In addition, arrestees are afforded an opportunity to make a telephone call and to acquire legal services.  *Id.*

II.

*The Roe Plaintiffs' Request to Proceed Anonymously*

According to the Roe Plaintiffs, "they have acute fear of retaliation by the immigration authorities"  because they are bringing this suit.  As a result, they wish  to proceed anonymously. According to the Complaint, ICE has been known to retaliate against immigrants who have spoken out against immigration laws and practices.  In addition, the conduct of the ICE agents "disproportionately harms immigrants who have legitimate reason[9] to fear immigration authorities."  This gives rise to a "strong public interest" favoring anonymous filing pursuant to the Federal Rules.  As presented, the Roe Plaintiffs are seeking both non-disclosure of their identities in the public records, and that their identities not be disclosed to the Defendants whom they are suing.

The  Roe  Plaintiffs  seek  to  proceed  anonymously  because  of  fear  of  retaliation  by immigration officials for filing this lawsuit.  For the reasons set forth below, the Court finds that the Roe Plaintiffs have not satisfied the requirements for filing anonymously pursuant to Fed. R.

---

[9]        The "legitimate reasons" are not plead.

Civ. P. 5.2(e). More specifically, paragraphs 22 and 23 of the FAC enumerate the Roe Plaintiffs'

rationale.  These paragraphs state:

> 22.      Plaintiffs Carlos and Carla Roes 1-4 seek to proceed
> pseudonymously because they have an acute fear of retaliation by
> the immigration authorities whom they sue here. ICE has been
> known to retaliate against immigrants who have spoken out against
> immigration laws and practices. *See, e.g.*, Laura Wides-Munoz,
> *Student activist says ICE targeted her family to silence her*,
> Associated Press, Mar. 4, 2008.

> 23.      Because the unconstitutional conduct described in this
> Complaint disproportionately harms immigrants who have
> legitimate reason to fear immigration authorities, there is a strong
> public interest in allowing plaintiffs to proceed pseudonymously in
> order to provide this Court with an opportunity to protect the
> constitutional rights of individuals in this most vulnerable group.

In paragraph 22, the Plaintiffs rely on a single newspaper article.  The article is about the

family of a student activist who testified before Congress and organized on behalf of the Dream

Act, a pro-immigration reform proposal. As a result of the student's lobbying activity, ICE

agents retaliated by raiding his parent's home.  The problem with the Roe Plaintiffs' application

is the inherent unreliability of newspaper stories -- they are obviously hearsay. *Barnes Found. v.

Township of Lower Merion*, 242 F.3d 151 (3d Cir. 2000). In the case at hand, the Roe Plaintiffs

proffer the newspaper article for its truthfulness; as such, the contents are hearsay.  Fed. R. Evid.

801(c); *see also*, *Tyson v. Willauer*, 290 F. Supp. 2d 278, 287 n.5 (D. Conn. 2003). Even if the

article were admissible, it provides unreliable proof that the same incident would happen here

where the facts are far different and in a different geographical area.

Generally, there is a strong presumption in favor of disclosure of the identities of the

parties to an action.  *Doe v. Hartford Life and Accident Ins. Co.*, 237 F.R.D. 545, 549 (D.N.J.

2006).   But this presumption may be rebutted where exceptional circumstances justify a

departure from the normal course. *Id.* "A plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998) (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)); see also *Schuldiner v. K Mart Corp.*, 284 F. App'x. 918, 921 n.2 (3d Cir. 2008).

For more than ten years in this Circuit, the courts have followed the test enunciated in *Doe v. Provident Life and Accident Ins. Co.*, 176 F.R.D. 464 (E.D. Pa. 1997). It instructs that the public's right to access should prevail unless the party requesting anonymity establishes a legitimate privacy or security issue. *Id.* at 467.

A substantive analysis of the matter requires disclosure. There are factors which must be weighed in determining whether Roe Plaintiffs may proceed anonymously. *See Lozano v. Hazelton*, 496 F. Supp. 2d 477 (M.D. Pa. 2007); *accord*, *Hartford*, 237 F.R.D. at 549-50 (D.N.J. 2006).

In *Doe v. Hartford*, Judge Linares succinctly listed the factors:

> (1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity.

Similarly there are factors which would weigh against the use of a pseudonym. These include:

> (1) the universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained;

and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated.

*Id.* at 549-50 (citation omitted).

In considering all of the above factors, the request to proceed anonymously fails. The bases upon which disclosure is feared are insufficient. First, a newspaper article is insufficient evidence. There must be particularized facts supported by the Complaint. An unrelated hearsay story is tenuous. Second, the Defendants have a substantial due process concern because it is difficult to mount a defense when you do not know the identity of plaintiff. *See Doe v. Del Rio*, 241 F.R.D. 154, 157 (S.D.N.Y. 2006) (quoting *U.S. v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). As such, concealing the identity of Roe Plaintiffs will prevent maintenance of an adequate defense. Third, this non-disclosure of identity of Roe Plaintiffs undermines public confidence and trust. Most Americans would cringe that the federal officials could be sued and be responsible to pay damages to an unknown party. Fourth, here the Roe Plaintiffs are seeking to curtail or prohibit future ORTS arrests. This federal program is a major initiative to enforce immigration laws. As such, a fair trial based on all the facts, including the credibility of the parties and witnesses, must be assessed by the trier of fact. Non-disclosure prevents same. In short, the Roe Plaintiffs place a major federal government program squarely in interest, the public interest in a fair and open trial trumps a weakly presented threat of retaliation.

As noted above, public confidence in the integrity of any decision in this case mandates that the trial be fair to all parties. The Roe Plaintiffs' application undermines this goal. In one case, Judge Munley permitted plaintiffs anonymity from the public, but the case at hand is clearly distinguishable. *Lozano*, 496 F. Supp. 2d at 506 (M.D. Pa. 2007). In *Lozano*, the primary issue was whether an ordinance was invalid on its face, while in the instant case, the

Plaintiffs are seeking quite a different remedy including money damages and equitable relief. The factual issues surrounding each incident are distinguishable.  The facial attack against an ordinance in *Lozano* is unlike the instant action because the proofs for a constitutional violation causing invalidity as opposed to allowing for an award of damages are far apart.  In addition, in *Lozano*, a retaliation against plaintiffs was established at a hearing based on factual evidence. Nothing like that has been presented.

Here, any investigation and discovery requests by Defendants require the identity of the Plaintiffs as the  starting point.  The Roe Plaintiffs actually concede, in part, that it may be necessary for them to reveal their identities at some point. Their brief states:

> More importantly, should defendants – at some future date – require the identity of one or more of the plaintiffs (either for discovery purposes or for litigating the merits) the court and the parties can seek to accommodate their interests at that time.

This concession is illogical because Plaintiffs do not explain why non-disclosure is important at this juncture while that concern may be alleviated "at some future date."

The Court orders that the claims of the Roe Plaintiffs contained in paragraphs 133-186 of the FAC be dismissed without prejudice subject to the Roe Plaintiffs' right to amend their complaint to include their identities.

III.

*Subject Matter Jurisdiction over Claims Brought*
*by Alien Plaintiffs Who May Be Subject to Removal.*

Defendants argue in their second point that this Court lacks subject matter jurisdiction over the claims of Plaintiffs Ontaneda, Carla Roe 1, Carlos Roe 2, and Carla Roe 3, as these Plaintiffs were aliens subject to removal.  Therefore, Defendants assert the claims made by these Plaintiffs should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).  For the reasons that follow,

this Court finds that it has subject matter jurisdiction over the claims of plaintiff Ontaneda (see supra at 7 - 8).   As the claims of the anonymous Plaintiffs have been dismissed without prejudice, this Court declines to consider whether it has subject matter jurisdiction over their claims pursuant to 8 U.S.C. § 1252(b)(9) or (g).

A.      *Standard of review on a motion to dismiss for lack of subject matter jurisdiction.*

Before it can reach the merits of Ontaneda's claims under, this Court must decide whether it has the ability to review Ontaneda's claims at all.  *See In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 249 (3d Cir. 2003). Generally, "[a] court that is without proper jurisdiction cannot proceed at all, and must merely note the jurisdictional defect and dismiss the suit." *Larsen v. Senate of the Commw.*, 152 F.3d 240, 245 (3d Cir. 1998).  Accordingly, this Court must review a damages claim based upon Ontaneda's status as a now-departed illegal alien.

Pursuant to the Federal Rule of Civil Procedure 12(b)(1), a claim can be dismissed for "lack of jurisdiction over the subject matter."  This motion to dismiss may be asserted at any time in a case.  *In re Kaiser Group Int'l, Inc.*, 399 F.3d 558, 565 (3d Cir. 2005).  In a motion to dismiss based on subject matter jurisdiction, "the standard . . . is much more demanding [than the standard under 12(b)(6)].  'When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion.'" *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  If the defendant's attack is facial, "the Court assumes that the allegations in the complaint are true, and may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction." *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d 474, 479-80

(D.N.J. 2008) (citing *Cardio-Med. Assoc., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983) and *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999)).

B.   *Dismissal of Ontaneda's claim pursuant to Fed. R. Civ. P.12(b)(1) is inappropriate at this time.*

Defendants assert a challenge to the District Court's jurisdiction over Ontaneda's *Bivens* claims because they claim that 8 U.S.C. §1252, entitled "Judicial Review of Orders of Removal," deprives the District Court of jurisdiction over any claims "arising from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Defendants also assert that this Court is deprived of jurisdiction over Ontaneda's claims because "the Act precludes challenges to the Government's decisions and actions 'to commence removal proceedings, adjudicate cases, or execute removal orders.'" (Def. Br. at 14, quoting 8 U.S.C. § 1252(g)).   As a preliminary matter, the Supreme Court has held that statutory jurisdiction stripping provisions should be interpreted based upon "the strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).   "Where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988).   Before a statute will be construed to restrict access to a civil rights claim in a district court, there must be clear and convincing evidence of congressional intent to deprive the district courts of jurisdiction.  *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974).   This requires a "heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603.  In light of this standard, each of the Defendants' arguments will be examined separately.

Defendants seek dismissal for lack of subject matter jurisdiction because they claim that 8 U.S.C. § 1252(b)(9) precludes review of Ontaneda's claims by any district court[10].  Defendants claim that Ontaneda's only forum for redress is the Immigration Court, and that subsequent review of his case takes place in the Court of Appeals only after a final order of removal has been issued.  The plain language of that section states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code or any other habeas corpus provision, by section [28 U.S.C. §1361 or 1651], or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

In 1996, Congress amended the Immigration and Nationality Act (INA) by way of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) and the Antiterrorism and Effective Death Penalty Act (AEDPA) to preclude judicial review of any portion of a deportation proceeding other than final orders for removal, thereby vesting jurisdiction over orders for removal in the Circuit Courts of Appeal. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 476 (2001) ("AADC"); *see also Valdivia v. INS*, 80 F. Supp. 2d 326, 327 (D.N.J. 2000)[11].

---

[10]     One can understand the government's argument that a civil rights complaint may act as a foil to deportation giving an immigrant a very valuable civil rights suit.  If this is so, the court must be mindful that immigrants may institute many such cases in order to avert deportation.  Although it is not the case here, such issues may be resolved in accordance with the timing of when a complaint is filed.  *cf. Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

[11]     The specific provisions at issue in this case were added to § 1252 by the IIRIRA.

By its clear language, §1252(b)(9) applies to all claims, whether statutory or constitutional, "arising from any action taken or proceeding brought to remove an alien from the United States." Immigration Courts are administrative courts governed under the Administrative Procedure Act (APA). As such, these Article I courts adjudicate thousands of petitions each year, and their expertise in adjudicating such petitions is not at issue. What is at issue, rather, is whether Congress, in limiting jurisdiction over "Orders of Removal," actually intended to deprive the district courts of the ability to review claims for damages resulting from other alleged civil rights violations. Certainly, Immigration Courts, for all their expertise, are neither jurisdictionally nor procedurally equipped to handle such claims.

There is little, if any, precedent in this Circuit that is directly on point. However, several other circuits have examined the issue. In *Aguilar v. U.S. Immigration and Customs Enforcement*, 510 F.3d 1, 13-14 (1st Cir. 2007), the First Circuit held that, because the petitioners' claims arose directly from removal proceedings, those claims were barred from review before a district court by §1252(b)(9). The First Circuit also stated that the claims should instead be channeled into the administrative review process delineated by the INA, causing petitioners' claims to be reviewed first by the immigration judge, then by the Board of Immigration Appeals, and finally by the Circuit Court of Appeals. *Id.* In dicta, that court also stated that, "[w]ith respect to [§ 1252 (b)(9)], [the] words ["arising from"] cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien." *Id.* at 10. That court further stated that "the legislative history [of §1252(b)(9)] indicates that Congress intended to create an exception for claims 'independent' of removal." *Id.* at 11 (citing H.R. Rep. No. 109-72, at 175, as reprinted in 2005 U.S.C.C.A.N. at 300). The First Circuit explained that habeas review of challenges to detention, claims for bail,

23

and claims for money damages under *Bivens* were all likely to be independent, excepted claims separate and apart from challenges to removal orders covered by §1252(b)(9).  *Id.*

Similarly, in *Arar v. Ashcroft*, 532 F.3d 157, 192-93 (2d Cir. 2008), the Second Circuit concluded that plaintiff's complaint needed to be dismissed for failure to state a claim upon which relief might be granted and because the facts alleged did not rise to the level necessary to create a free standing damages claim under *Bivens*. It nonetheless stated that "the test for determining whether [a statute vesting exclusive jurisdiction in the courts of appeals] precludes a district court from hearing a particular claims is . . . whether the claim could and should have been presented to and decided by a court of appeals.'" *Id.* at 170 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958) (alterations in original).  That court also opined that congressional intent to deprive the district courts of jurisdiction over review of even constitutional claims must be clear.  *Id.* at 169 (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)).

Here, it is not abundantly clear that Ontaneda's claims could have been brought up through the administrative process delineated by 8 U.S.C. § 1252.  The specific conduct of which Ontaneda complains does not involve deportation proceedings in Immigration Court. Rather, it is the entry into and search of his home by ICE agents without his consent, without a valid search or arrest warrant for Ontaneda himself or any of the occupants, and without probable cause or exigent circumstances necessitating their entry, all of which he claims are violations of his Fourth Amendment right to be free from unreasonable searches and seizures, that form the basis of Ontaneda's *Bivens* claims.  Further, Ontaneda complains of his arrest, not based upon its validity before the Immigration Court in deportation proceedings, but because he claims it was effectuated based upon his race and ethnicity, in violation of his Fifth Amendment

right to equal protection under the law.  Ontaneda alleges in the FAC that he presented a valid

North Carolina driver's license to the ICE agents who entered his home; that he was never asked

about his immigration status prior to his arrest; and that he was arrested even after ICE agents

learned that no outstanding deportation orders existed for him.  Ontaneda does not bring a claim

seeking to invalidate his arrest and challenge a final order for removal.  Ontaneda does not

challenge an order of removal, nor does it appear from the record that one was ever entered

against him.[12]   In fact, according to Plaintiffs' opposition brief, Ontaneda was granted a

Voluntary Departure subsequent to the filing of the FAC.[13]   (Pl. Br. at 5).  Instead, Ontaneda

brings this claim for money damages under *Bivens* against the Defendants whom he claims

violated his constitutional rights.  His constitutional claims could not be brought before an

immigration court because he does not seek to challenge his removability.  (See Pl. Br. at 14).

Therefore, because Ontaneda's claims are outside the ambit of the administrative process, they

are independent and excepted claims in accordance with the plain language of §1252(b)(9).

Defendants have indicated that the District of Minnesota recently decided a case, *Arias v.*

*U.S. Immigration and Customs Enforcement, Div. of the Dept. of Homeland Security*, Civ. No.

07-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008), in which that court dismissed similar

claims of removable aliens to those made here by Ontaneda §1252 (b)(9) for lack of subject

matter jurisdiction.  *Arias* is factually distinguishable from the matter *sub judice*.  In *Arias*, the

---

[12] According to Plaintiffs' brief, Ontaneda was allowed to voluntarily depart the United
States.  (Pl. Br. at 5).  To the extent that the Third Circuit has declared that any order
"determin[ing] that an alien *is* removable" when coupled with "a contingent order of removal" is
deemed a final order for purposes of review, *see Obale v. Att'y Gen. of the U.S.*, 453 F.3d 151,
160 (3d Cir. 2006), it is also this Court's understanding that Ontaneda is not challenging that he
was a removable alien.  (Pl. Br. at 14).

[13]        There is nothing in the record that Ontaneda voluntarily waived his right to bring
a civil rights suit when he voluntarily agreed to depart.

district court held that it did not have subject matter jurisdiction over the removable plaintiffs' *Bivens* claims because they were in the midst of removal proceedings.  Thus, stated the court, the constitutional violations claimed by the removable plaintiffs were "common in removal proceedings and could directly impact Plaintiffs' immigration status."  Here, however, Ontaneda, who was allowed to voluntarily depart the United States, is not in the midst of a removal proceeding, does not challenge a removal order, and therefore cannot bring his claims for constitutional rights violations as a part of the removal proceedings.  While the intent of Congress was to channel claims arising from actions to remove undocumented aliens from the United States through the administrative process, it is clear from the very title of the statute, "Judicial review of orders of removal," that the Congressional mandate to channel litigation does not and cannot extend to the factual circumstances of Ontaneda's particular case.

If this Court is deprived of jurisdiction over Ontaneda's damages claims, there will be no forum where he can seek redress of his grievances against the government Defendants.  Review of a final order of removal cannot and will not grant him redress– no final order of removal is in place as to this plaintiff.  Given the unique factual circumstances of Ontaneda's case– that he merely seeks damages and does not request an invalidation of his departure from the United States – and given the inability of this plaintiff to seek redress in any other forum, it would be an unjust result to deprive this court of subject matter jurisdiction over Ontaneda's claims.  Further, absent clear and convincing evidence of the intent of Congress to deprive this Court of subject matter jurisdiction to hear damages claims in this factual context, this Court finds that it is vested with subject matter jurisdiction sufficient to review Ontaneda's *Bivens* claims.  As a result, based

upon the unique factual situation surrounding Ontaneda's circumstances, this Court declines to grant Defendants' motion under Rule 12(b)(1).[14]

Defendants' second argument is that §1252(g) deprives this Court of subject matter jurisdiction over Ontaneda's claims because it implicates ICE's decision to commence proceedings against Ontaneda.  For the reasons that follow, this argument fails.

Subsection (g) states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including [28 U.S.C.S. § 2241], or any other habeas corpus provision, and [28 U.S.C.S. §§ 1361 and 1651], *no court shall have jurisdiction to hear any cause or claim by* or on behalf of *any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.*

8 USC. § 1252(g) (emphasis added).   In *AADC*, 525 U.S. at 482, the Supreme Court discussed the applicability of §1252(g) to claims by aliens based upon their being removed from the United States.   As was clearly stated by the Supreme Court, §1252(g) applies only to the three circumstances listed therein: commencement of proceedings, adjudication of cases before an immigration court, and execution of removal orders. *Id.*  The Court discussed the long history leading up to the amendments to the INA in the IIRIRA, stating that the INA was amended to protect the Attorney General from lawsuits for declining to exercise its discretion in dealing with the removal of undocumented aliens.

---

[14]     In practice, giving administrative bodies the right to assess civil rights suits does not make the most sense.  For example, Congress did not give administrative bodies the right to issue a warrant which includes entering a residence.  Despite that fact, the government argues that agents on the street may enter a residence if there is consent and a review of that consent goes to the administrative agency.  It is more plausible that Congress believed the validity of consent to enter a residence should remain with the judiciary.

Because the congressional mandate was to channel litigation into a single administrative process with review before the Circuit Courts of Appeals, the Court opined that "[s]ection 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." *Id.* at 485.

The Supreme Court further examined §1252(g) in *St. Cyr*, 533 U.S. at 31, *superseded by statute*, 119 Stat. 302 § 106 (May 11, 2005).[15]   In that case, the Court stated that "[i]n . . . [*AADC*], we explained that that provision applied only to three types of discretionary decisions by the Attorney General -- specifically, to commence proceedings, to adjudicate cases, or to execute removal orders -- none of which [were] at issue [in St. Cyr's case]." *Id.*

The Third Circuit also recently examined §1252(g) with reference to the Circuit Court's jurisdiction to review a final order of removal.  In *Garcia v. Att'y Gen. of the U.S.*, 545 F.3d 252, 256 (3d Cir. 2008), the Third Circuit held that subsection (g) was only applicable to review of three specific discretionary decisions made by the attorney general: the decision "to commence proceedings, adjudicate cases, or execute removal orders." (Internal quotation marks omitted). The Third Circuit specifically explained that "[d]espite its apparent broad reach, therefore, §1252(g) "is to be read narrowly and precisely" to prevent review only of the three narrow discretionary decisions or actions referred to in the statute." *Id.* (quoting *Sabhari v. Reno*, 197

---

[15]  The REAL ID Act of 2005 specifically limited the district court's ability to review petitions for habeas corpus under the INA.  The Act amended the language of subsection (g) to add a specific reference to habeas corpus claims.  However, as this is not a case that implicates a review of a petition for habeas corpus, the amendment does not bear upon the outcome of the case *sub judice*.

F.3d 938, 942 (8th Cir 1999) and citing *Fornalik v. Perryman*, 223 F.3d 523, 531 (7th Cir. 2000)).

Here, as is clear from the complaint, no order of removal had been entered against Ontaneda at the time of his arrest.  (See FAC ¶ 111-124).  Further, the entry into Ontaneda's home and his subsequent arrest did not occur as part of a decision to adjudicate his case, as it does not appear from the record that any proceedings had yet been instituted against him. Rather, Defendants argue, Ontaneda's claims should be barred because the activities of which he complains fall within the "decision to commence proceedings" against him.

Based upon the record, it is fairly clear that Ontaneda was not arrested to commence proceedings against him, and the Government does not make this claim.  Rather, the Defendants state in their reply brief that "ICE agents arrived at plaintiffs' residences to commence removal proceedings against illegal aliens."  (Def. Reply Br. at 11).  While it is true that the statute plainly bars challenges to the decision or action of the Attorney General to the commencement of proceedings against an alien, Defendants' interpretation of the language goes too far.  It seems, rather, that the decision to commence proceedings against Ontaneda arose from his arrest, rather than that his arrest arose from a decision to commence proceedings. The difference, while seemingly semantic, is important to the analysis of Ontaneda's claims.  *See, e.g.*, *Khorrami v. Rolince*, 493 F. Supp. 2d 1061, 1068 (N.D. Ill. 2007) (finding that the plaintiff's claims in that case bore "more than a cursory relationship to the decision to commence proceedings," that the claims, in fact, were "a direct outgrowth of the decision to commence proceedings," and therefore were barred under §1252(g)).

Based upon the attendant circumstances, Ontaneda was arrested for the purposes of investigation into his status.  He presented a valid North Carolina driver's license to authorities

when asked.  He was not asked about his immigration status prior to his arrest, and it is not clear from the record that the decision to arrest Ontaneda, or any of the other named Plaintiffs for that matter, occurred as a result of a decision to commence proceedings against any of them. Because the search, seizure, and arrest were all investigative in nature, they fall outside the channeling provisions of §1252(g).  *AADC*, 525 U.S. at 482.  As a result, based upon the unique factual circumstances attendant to Ontaneda's claims, this Court finds that it is vested with subject matter jurisdiction sufficient to review this matter.

IV.

*Plaintiffs Believed To Be Unlawful*
*Aliens' Ability To Pursue Bivens Claims.*

Defendants argue that certain claims brought by the Plaintiffs believed to be unlawful aliens seek an unauthorized extension of *Bivens*, 403 U.S. at 388.  *Bivens* held that a plaintiff could sue a federal agent in federal court for damages for violations of the Fourth Amendment right to be free from unreasonable searches and seizures.   *Id.* at 397. Subsequent Supreme Court decisions established a so-called *Bivens* action could be brought against federal officials for violations of the due process protections of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and for violations of the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14, 19 (1980).

Again, Defendants argue that this Court cannot imply *Bivens* claims on behalf of Plaintiffs believed to be unlawful aliens.  These Plaintiffs are Carla Roe 1, Carlos Roe 2, Carlos Roe 3, Ontaneda, and Argueta.  This Court has already dismissed these three Roe

Plaintiffs and declines to consider whether their claims amount to an unauthorized extension of *Bivens*.  Ontaneda's and Argueta's claims remain.

At the time of arrest, Ontaneda was believed to be unlawfully present in this country and was subsequently allowed to voluntarily depart the United States, while Argueta has had valid Temporary Protection Status since 2001, allowing her to remain lawfully in the United States.  She alleges that while certain Defendants were searching for a male criminal, they entered her residence without informed consent and during their search of the premises arrested her on the erroneous belief that she was unlawfully present in the U.S. despite clear and easily-verifiable evidence to the contrary.  She was taken into custody and released 36 hours after she was arrested. Ontaneda brings *Bivens* claims for violations of the Fourth Amendment right to be free from unreasonable searches and seizures and the Fifth Amendment's equal protection guarantee.  Plaintiffs argue that these are garden-variety *Bivens* claims, that implies a cause of action is a straightforward application of *Bivens* and its progeny. In order to determine whether Bivens is applicable, Plaintiffs must overcome two hurdles.  They are whether (1) there is no alternative, existing process for protecting Plaintiffs' constitutional interests, and (2) if there are no special factors counseling hesitation against a judicially-created remedy.  *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597 (2007). Further, since the early eighties, the Supreme Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts."  *Corr. Svcs. Corp. v. Malesko*, 534 U.S. 61, 69-70 (2001) (citation omitted).

A.      *Whether the INA's comprehensive statutory scheme protects the Plaintiffs' constitutional interests and precludes a Bivens remedy.*

The government argues that a *Bivens* remedy [w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988).

In addition, the government contends that the INA is a "the comprehensive federal statutory scheme for regulation of immigration and naturalization," *DeCanas v. Bica*, 424 U.S. 351, 353 (1976).  And since Congress has made a comprehensive foray into the area at issue, a court must "stay its *Bivens* hand," even if that leaves certain plaintiffs without remedy for certain constitutional violations.  *Wilkie*, 127 S. Ct. at 2600*; see also Bush v. Lucas*, 462 U.S. 367 (1983).

However, other courts disagree with the government's position. Addressing alleged violations of aliens' Fourth and Fifth Amendment rights, one district court held that the INA "is by no means a comprehensive *remedial* scheme for constitutional violations that occur incident to the administration of that regulatory scheme." (emphasis in original). *Turkmen v. Ashcroft*, No. 02-cv-2307, 2006 WL 1662663 *29 (E.D.N.Y. June 14, 2006).  Similarly, *Cesar v. Achim*, 542 F. Supp. 2d 897, 900 (E.D. Wis. 2008) observed that provisions of the INA addressing apprehension, detention, and removal are "merely regulatory, defining the Attorney General's powers and duties regarding the detention and removal of aliens, and do not mention or provide any means of redress for constitutional violations."  Further, the First Circuit explained that a claim for money damages under *Bivens* was likely to be an

independent claim, separate and apart from challenges to removal orders covered by § 1252(b)(9).  *Aguilar*, 510 F.3d at 11.

Instead, Defendants argue that this Court should follow the example of *Lucas*, wherein the Supreme Court declined to imply a *Bivens* remedy due to administrative remedies that provided "comprehensive procedural and substantive provisions giving meaningful remedies against the United States."  462 U.S. at 368.  The Court observed in a footnote that, by statute, federal employees were left without remedies against their supervisors for certain discrete personnel actions, such as improper short suspensions or wiretapping, yet the Court would not create remedies.  *Id.* at 385 n.28.   The government additionally argues that when creating a complex statutory scheme, Congress chooses to provide certain remedies, and chooses not to provide others, and it is not for courts to override congressional intent.  *See Shreiber v. Mastrogiovanni*, 214 F.3d 148, 152 (3d Cir. 2000).

The focus of this Court is on "whether it is appropriate to create a damages action to remedy the wrong in light of what Congress has done."  *Id.* at 154.  Previously, the Court concluded  Ontaneda's *Bivens* claims could not have been brought through the administrative process delineated by statute (8 U.S.C. § 1252).  This Court held that it had subject matter jurisdiction over Ontaneda's *Bivens* claims because there would be no forum where he could seek redress for his grievances against Defendants.   That rationale applies equally here. Ontaneda is not before an immigration court; he does not seek to challenge his removability. It would be odd and unjust for Congress to bar Ontaneda from bringing constitutional claims simply because he does not challenge his removal.

As for Argueta's *Bivens* claims, it is not clear how she could even be involved in the administrative process outlined in the INA.   Her only chance for relief for the claims at issue is before this Court.   Argueta is simply a lawful resident who was detained for 36 hours and then released.   This occurred because federal officials happened to be under the mistaken belief that she was in this country illegally.   Her claim for damages due to federal officials' violations of her Fourth Amendment right to be free from unreasonable searches and seizures is an ordinary claim that is properly before this Court.   In this Court's view, it is clear that Congress did not intend to strip this Court from allowing a *Bivens* claim where federal officials may have violated lawful residents' fundamental constitutional rights.

B.      *Whether the Executive's and Congress's plenary power over immigration is a special factor that precludes a Bivens remedy.*

This Court must next decide whether Congress' and the Executive's plenary power over immigration is a special factor that counsels against the creation of a *Bivens* remedy. The government argues that the Executive branch has such plenary power over immigration as to largely immunize its decisions in this area from judicial review.   *See Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952).   This argument is unavailing.   Executive power over immigration largely springs from congressional delegation of this power.   *See Galvan v. Press*, 347 U.S. 522, 531; *accord Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). Although the INA grants the Executive certain powers over immigration, Congress has not issued a statutory directive to bar § 1983 actions.   Given the delineation of executive power in the INA, the government cannot cogently make the argument that the Executive's power over immigration matters outwardly counsels against this Court's hearing Plaintiffs' *Bivens* claims.

Next, Defendants posit that to interfere in this matter would unnecessarily enmesh this Court in difficult foreign affairs and public policy issues, as well as matters of national security. This argument misinterprets what is before this Court.  This case is not about "sensitive political functions that implicate questions of foreign relations."  *I.N.S. v. Abudu*, 485 U.S. 94, 110 (1988).  Rather, it is about individuals alleging that their basic constitutional rights were violated by Government actors.  Although the government's argument has merit, it is an essential principle of liberty that "where federally protected rights may have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."  *Bell v. Hood*, 327 U.S. 678, 684 (1946).  The Court finds no reason to adjust that policy.

V.

*Personal Jurisdiction Over Defendants Myers and Torres.*

Defendants next assert that this Court lacks personal jurisdiction over Defendants Myers and Torres because neither of those Defendants is a resident of New Jersey, and neither defendant has sufficient minimum contacts with New Jersey for this court to sustain jurisdiction over these Defendants.  For the reasons that follow, this argument likewise fails.

Pursuant to Fed. R. Civ. P. 12(b)(2), a complaint may be dismissed for lack of personal jurisdiction.  "If an issue is raised as to whether a court lacks personal jurisdiction over a defendant, the plaintiff bears the burden of  showing that personal jurisdiction exists." *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2007).  "To meet this burden, the plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contacts with the forum state ('general jurisdiction')." *Provident Nat'l Bank*

*v. CA Fed. Sav. & Loan Assn.*, 819 F.2d 434, 437 (3d Cir. 1987) (citations omitted).  Under

Fed. R. Civ. P. 4(k), "'a federal district court may assert personal jurisdiction over a

nonresident of the state in which the court sits to the extent authorized by the law of that

state.'" *Id.* at 296 (quoting *Provident Nat'l Bank*, 819 F.2d at 437; Fed. R. Civ. P.

4(k)(1)(A)). Pursuant to the New Jersey long-arm rule, N.J. Court R. 4:4-4(c), personal

jurisdiction in New Jersey "extends to the limits of the Fourteenth Amendment Due Process

protection." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145 (3d Cir. 1992).

Therefore, this Court is "constrained, under New Jersey's long-arm rule, only by the

'traditional notions of fair play and substantial justice,' inhering in the Due Process Clause of

the Constitution." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Those notions require that a defendant have certain minimum contacts with the forum state

based upon the defendant's own purposeful availment "of the privilege of conducting

activities within the forum State, thus invoking the benefits and protections of its laws."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  Unilateral activity on the part of

the plaintiff will not cause the defendant to be subject to personal jurisdiction in that forum.

*Id.*

However, physical entry into the forum state is not necessary to maintain personal

jurisdiction over a defendant.  *Id.* at 476. While a presence in the forum will only serve to

enhance a defendant's affiliation therewith and serve to reinforce foreseeability of suit

therein, "it is an inescapable fact of modern commercial life that a substantial amount of

business is transacted solely by mail and wire communications across state lines, thus

obviating the need for physical presence within a State in which business is conducted." *Id.*

36

All that is necessary for sufficient minimum contacts to be established in the forum state is for the "actor's efforts [to be] 'purposefully directed' toward residents of another State." *Id.*

Here, Myers and Torres, who are not domiciled in New Jersey, claim that they do not have sufficient minimum contacts with New Jersey to justify being haled into court here. The three-pronged test for specific personal jurisdiction requires that: (1) the nonresident defendant must purposefully direct his activities at the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). It appears to this Court that Plaintiffs have alleged sufficient facts in the FAC to subject both Myers and Torres to the personal jurisdiction of this Court, at this stage of the litigation, based upon the specific acts and omissions alleged with regard to ORTS.

Myers and Torres certainly had sufficient minimum contacts with New Jersey to justify their being sued in New Jersey based upon their specific actions with reference to ORTS. As alleged in the FAC, Myers and Torres "facilitated the creation of a culture of lawlessness and lack of accountability within an agency they supervise." (FAC ¶ 191). Further, it is alleged that Myers and Torres had personal knowledge of the allegations of lawlessness based upon the numerous lawsuits filed against them in 2006 and 2007 (FAC ¶ 192), and that they were both "made aware of the unconstitutional home-raid practices through lawsuits, congressional inquiries, repeated national media reports, memoranda and other sources." (FAC ¶ 195). In addition, it is alleged that Torres had direct responsibility for the execution of fugitive operations within ORTS. (FAC ¶ 194). These facts

demonstrate that Myers and Torres purposefully directed their supervisory activities at New Jersey.  These allegations therefore meet the first prong of *O'Connor*.

Likewise, the allegations meet prong two of *O'Connor*– that the alleged wrong arises out of the activities directed at the forum.  Plaintiffs have alleged a supervisory claim against Myers and Torres based upon their failure to properly supervise, investigate claims of unlawful home raids, and discipline their New Jersey staff.  The alleged wrong arises directly out of Defendants' forum-based activities.

Finally, the allegations meet the third prong of *O'Connor*– the fair play and substantial justice test.  It is clear from the facts presented in the complaint that Plaintiffs have, at the very least, stated a basis upon which this Court may exercise personal jurisdiction over Myers and Torres in their capacities as supervisors.  Their activities as supervisors in ORTS were purposefully directed at New Jersey, and it would not be unfair to them for this Court to exercise jurisdiction over them based upon these activities, given the small distance between Washington, D.C. and New Jersey, and the great stake the District of New Jersey has in preventing violations of its residents' constitutional rights.  Subjecting Myers and Torres to personal jurisdiction in this forum, based upon this specific set of facts, does not offend traditional notions of fair play and substantial justice.

Therefore, Myers and Torres are subject to the jurisdiction of this Court.  Defendants' motion to dismiss for lack of personal jurisdiction is denied.

VI.

*Qualified Immunity of the Supervisory Defendants.*

Lastly, Defendants argue that the four Supervisory Defendants are entitled to qualified immunity and should therefore be dismissed from this lawsuit.

The doctrine of qualified immunity is intended to shield government officials in their individual capacities from the entirety of the litigation process where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts emphasize that "qualified immunity is an immunity from suit as well as from liability." *Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, 128 S. Ct. 2931 (June 16, 2008), and that an important purpose of qualified immunity is to protect government officials from the "burdens of broad-reaching discovery." *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998).

In order to overcome qualified immunity, a plaintiff must allege facts to show that an individual defendant had personal involvement in the alleged wrongdoing. Liability cannot be based on the theory of *respondeat superior*. "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citation omitted). Plaintiffs argue mainly that the Supervisory Defendants had actual knowledge of and acquiesced in the alleged constitutional violations.

The Third Circuit has formulated several ways in which a plaintiff can show a defendant's knowledge of and acquiescence in conduct that violates the Constitution. Knowledge and acquiescence attach where a supervisor tolerates past or ongoing misconduct, *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 724-25 (3d Cir. 1989), or where the supervisor is "aware of the problems . . . but d[oes] nothing to stop them." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479 (3d Cir. 1990). Knowledge and acquiescence can also be understood as "adopting and maintaining a practice, custom or policy" that contributed to the alleged violations. *Stoneking*, 882 F.2d at 724-25. Examples

of this behavior are showing reckless indifference to the alleged violations or concealing and discouraging complaints about such conduct. *Id.* The language in *Stoneking* is grounded in the precedent of *Monell v. Dept. of Social Svc's of the City of New York*, 436 U.S. 658 (1978), where the Court rejected *respondeat superior* liability for local governments and limited such liability to instances where implementation of a local government's official policies or established customs inflicts the constitutional injury. *Id.* at 694. Another similar formulation of personal involvement in an official capacity is when that official is a "moving force" behind the alleged deprivation. *Maples v. City of Atl.antic City*, Civ. No. 06-2200, 2008 WL 2446825, at *4 (D.N.J. June 16, 2008) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

Defendants argue for a more strict pleading standard. *Bell Atl. v. Twombly*, 550 U.S. 544 (2007). The *Twombly* Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008).

Post-*Twombly*, the applicable pleading standard in a civil rights case is, generally, that the plaintiff must provide "some factual allegation in the complaint . . . providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Twombly*, 550 U.S. at 535 n. 3 (citing Wright & Miller § 1202, at 94, 95). Further, this matter comes to the Court on a motion to dismiss. Therefore, there is no discovery as to the supervisors' involvement. Without some discovery, it is difficult for a court to dismiss the claims against the supervisors. *See Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000). "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal" and "summary judgment is the right way to handle claims of immunity." *Id.* (Easterbrook, J., concurring). With these observations in mind, the Court turns to Plaintiffs'

allegations to determine whether they can, in opposing a motion to dismiss, and overcome

the four Supervisory Defendants' claims of qualified immunity.

In their brief in opposition to this motion, Plaintiffs summarize their allegations of the

Supervisory Defendants' personal involvement.  Plaintiffs allege that the Washington, D.C.-

based Supervisory Defendants, Myers and Torres,:

> (i) created and directed Operation Return to Sender; (ii) were
> repeatedly informed of the specific and predictable abuses by
> ICE agents in New Jersey and elsewhere–not just via media
> reports, but also in congressional testimony, a letter from the
> National Immigration Forum, a phone call from the mayor of
> New Haven and multiple lawsuits around the country naming
> them as defendants; (iii) despite being put on notice of repeated
> unlawful conduct by agents acting pursuant to their policies,
> took no actions to reprimand, train or otherwise prevent
> continued violations; (iv) regularly commented on the
> Operation Return to Sender's procedures in response to public
> criticism, and (v) routinely boasted of the operation's success
> in New Jersey and nationwide, notwithstanding those
> criticisms.

Plaintiffs allege that the New Jersey-based Supervisory Defendants, Weber and Rodriguez,:

> knew that ICE agents were entering and searching homes in
> New Jersey without search warrants and without obtaining
> voluntary, informed consent . . . . Despite this knowledge,
> neither Weber nor Rodriguez took any steps to correct such
> unconstitutional conduct and instead publicized the 'success'
> of these raids while allowing the conduct to persist.
> Accordingly, defendants Weber and Rodriguez at best
> acquiesced in, and at worst, encouraged such [wrongful]
> behavior.

Plaintiffs must demonstrate that the four Supervisory Defendants had knowledge and

acquiesced to the searches of the homes.  The dilemma here is that the allegations as outlined

in the complaint are hearsay based upon newspaper articles (see supra at 16). A court will not

rely upon inadmissable hearsay.  Fed. R. Evid. 802; *see also United States v. Lawrence*, 349

F. 3d 109 (3d Cir.), cert. denied, 542 U.S. 944 (2004).  The Myers Letter addresses the

concern about illegal searches, and it states that all information is "taken . . . seriously and will fully investigate all allegations," which comport with Defendants' view.   As previously noted, a complaint will defeat a motion to dismiss so long as there is fair notice and grounds on which the claims rest.  *Twombly*, 550 U.S. at 556.  In this case, the complaint sufficiently asserts the claim.

At this stage in the litigation, prior to discovery, this Court is reluctant to deny Defendants' claim about qualified immunity where controversy exists. At this point, there is an insufficient record to shut the door on a qualified immunity defense.  More evidence is needed before this Court can more capably decide whether defendants were personally involved.  *See Jacobs*, 215 F.3d at 775.

Qualified immunity is a shield from both liability and burdens of the litigation process. *Crawford-El*, 523 U.S. at 587.  Rather than overreach on granting motions to dismiss, courts should rely on control of discovery and summary judgment to "weed out unmeritorious claims."   *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168-69 (1993). The *Iqbal* case suggested that reciprocal discovery be limited and tightly controlled so that a defendant can probe for amplification of a plaintiff's claims and so that a plaintiff may probe such matters as Defendants' personal involvement in the challenged conduct. *Iqbal*, 490 F.3d at 158.

With this guidance in mind, the Court seeks to minimize the burdens of discovery by providing that the discovery that goes forward be limited and that it allow for the most efficient use of the Defendants' time. The Court therefore orders that Plaintiffs' discovery of the four Supervisory Defendants Myers, Torres, Weber, and Rodriguez be limited to

interrogatories and one deposition of each supervisor, for a total of four depositions. Defendants may also seek limited discovery on Plaintiffs' knowledge of issues concerning qualified immunity of the four supervisors.  After the discovery, the parties may move for appropriate relief on the issue of the Supervisory Defendants' qualified immunity.

VII.

Accordingly, this Court denies Defendants' motions to dismiss except that it grants the dismissal of claims brought by the anonymous Roe Plaintiffs, and it further Orders discovery on the issue of qualified immunity of the Supervisory Defendants is to be completed within sixty days.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

May 6, 2009