**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARIA ARGUETA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND<br>CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | Civil Action No.: 08-1652 (PGS)<br><br><br>**OPINION II** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendants, Julie Myers, John Torres, Scott Weber and Bartolome Rodriguez's (the "Individual Federal Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(6) and 15. The Second Amended Complaint alleges civil rights violations of the Fourth and Fifth Amendments against federal officials pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and against state officials pursuant to 42 U.S.C. 1983 and the N.J. Constitution, for partaking in a practice of unlawful and abusive raids of immigrant homes.

## I.  PROCEDURAL HISTORY

Defendants previously moved on similar grounds to dismiss the First Amended Complaint. On May 6, 2009, the Court granted in part and denied in part Defendants' motion to dismiss the First Amended Complaint.  As to the Individual Federal Defendants, the Court denied their motion to dismiss on qualified immunity grounds and ordered limited discovery to take place.  On May 20, 2009, the Individual Federal Defendants filed a motion for reconsideration of the Court's May 6, 2009, Order.  On June 8, 2009, while the Motion for Reconsideration was pending, Plaintiffs filed their Second Amended Complaint against all defendants.  On June 18, 2009, the Individual Federal Defendants moved to dismiss Plaintiffs' Second Amended Complaint.  Because the Individual Federal Defendants' Motion for Reconsideration was pending at the time Plaintiffs filed their Second Amended Complaint, the Court will incorporate those arguments into the Individual Federal Defendants' Motion to Dismiss.

The Individual Federal Defendants raise the following arguments in support of their motion to dismiss: (1)  that the doctrine of qualified immunity bars all of Plaintiffs' claims against them; (2) that the Court lacks personal jurisdiction over two Washington D.C. based defendants, Myers and Torres; (3) that the Court lacks subject matter jurisdiction over the case.  The Court's prior May 9, 2009, ruling denied Defendants' motions to dismiss based upon both personal and subject matter jurisdiction.  The Second Amended Complaint has not raised any new or different jurisdictional issues.  The Individual Federal Defendants' Motion to Dismiss based upon personal jurisdiction and subject matter jurisdiction are denied for the reasons stated in the Court's previous Opinion.

The Individual Federal Defendants' current Motion to Dismiss, and Motion to Reconsider the Court's prior ruling, raise the U.S. Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129

S.Ct. 1937 (2009).   The *Iqbal* decision was released after the Court's prior decision and before Plaintiffs filed their Second Amended Complaint.  As such, the Court will reexamine the Individual Federal Defendants' argument that the doctrine of qualified immunity bars this suit based upon the *Iqbal* decision.

The First Amended Complaint involved thirteen Plaintiffs, five of whom wished to proceed anonymously due to alleged fears of retaliation based on their immigration status.  The Court dismissed all claims brought by the anonymous Plaintiffs subject to their right to amend the Complaint to include their identities.  Thereafter, Plaintiffs filed the Second Amended Complaint identifying one of the five anonymous Plaintiffs.

## II.  STATEMENT OF FACTS

The Court's May 6, 2009 Opinion recites in detail the facts of the case.  Thus, the facts will not be restated at length herein.

The claims of each plaintiff are strikingly similar. In each case, Plaintiffs allege that United States Immigration and Customs Enforcement (ICE) agents entered their home in the early morning hours without appropriate consent and/or warrants.[1]  The ICE agents had administrative arrest warrants, which did not authorize entry into a residence absent consent.  Plaintiffs allege they were "all victims of these unconstitutional home raid practices."  ICE agents allegedly "gained unlawful entry, through deceit, or in some cases, raw force" and subjected Plaintiffs to "physical or verbal abuse."  The individual allegations for each Plaintiff were set forth in detail in the Court's previous

_____

[1] One case is not similar  One plaintiff, Maria Argueta, did not allow the officers into her apartment immediately.  As a result, the officers spoke with her landlord/brother.  In turn, the landlord/brother persuaded plaintiff to allow the officers into her apartment.  The issue with respect to the validity of consent may need further examination after discovery is complete.

Opinion.  The Court's instant inquiry is focused on allegations concerning the Individual Federal Defendants.  A brief recitation of the facts relevant to the Individual Federal Defendants is instructive.

<u>A.  Operation Return to Sender (ORTS)</u>

In 2002, INS instituted a National Fugitive Operations Program.  About a year later, in the aftermath of 9/11, INS was subsumed into the Department of Homeland Security (DHS), and DHS continued the Program.[2]  From 2002 onward, the number of fugitive aliens in the country rose rapidly.  In 2006, there were 623,000 fugitive aliens.  In order to address this concern, DHS increased the number of Fugitive Operation Teams (FOTs) nationwide to fifty and dramatically increased the target numbers of arrests for each FOT.  In May 2006, DHS launched ORTS, which combined the resources of the prior program with those of other state and local law enforcement agencies in order to effectuate an "organized and methodical approach to the identification, location, and arrest of ICE fugitive aliens."[3]  As noted, ORTS focuses on fugitive aliens.  Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion, or have failed to report to a DRO [Office of Detention and Removal Operations] officer after receiving notice to do so."  (OIG Report at 2.)

Under ORTS, officials conduct their investigations by "focus[ing] their efforts on specific

---

[2]     *See* Department of Homeland Security, Office of Inspector General, "An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams," OIG-07-34 (Mar. 2007). (Second Am. Compl. Ex. C ("OIG Report") at 1.)

[3]     *See* Letter of Myers to Christina DeConcini of the Nat'l Immigration Forum, dated July 6, 2007. (Second Am. Compl. Ex. D ("Myers Letter").)

4

fugitive aliens at specific locations; that is, by prioritizing fugitive aliens by those who (1) are a threat to national security, (2) pose a threat to the community, (3) were convicted of violent crimes, (4) are convicted felons, and (5) are non-criminal fugitives". (Myers Letter at 2).   The basic unit of enforcement is a FOT.   In order to accomplish their goal of identifying, arresting, and removing fugitive aliens, "FOTs use leads and other intelligence based information."  (*Id.* at 1.) Such information is "gathered through law enforcement channels," and once it locates several fugitives in the same vicinity, the FOT "develop[s] an operational plan for the swift and safe arrest of the fugitive aliens in the most fiscally efficient way."  (*Id.*)

The arrest of fugitive aliens is tricky due to the nature of the warrant issued.  The procedure to obtain a warrant for removal is straightforward.  An order of removal is issued by an immigration judge after a hearing.  Upon receiving such an order, DRO issues a Warrant of Deportation/Removal. (*Id.* at 2.)  These warrants are administrative in nature, as opposed to judicial, and are unlike arrest warrants.  An arrest warrant allows police officers to enter a residence to arrest a person while the warrant of removal allows arrest, but it does not permit entry into a home.  Officers must "obtain consent before they are permitted to enter private residences."  (*Id.*)  DHS recognizes that "warrants of removal do not grant the same authority to enter dwellings as a judicially approved search or arrest warrant."  (*Id.*)

Ancillary to their authority to arrest based upon a warrant of removal is an ICE agent's authority to question any person about their immigration status.  8 C.F.R. § 287.5(a)(1).  However, an officer may only detain an individual for further questioning if the officer has "reasonable suspicion that the individual has committed a crime, is an alien who is unlawfully present, is an alien with status who is either inadmissible or removable from the United States, or is a non-immigrant

who is required to provide truthful information to DHS upon demand." (Myers Letter at 2) (citing 8 C.F.R. § 214.1(f)).

In order to obtain knowing and voluntarily consent from a dwelling's occupants, FOTs utilize interpreters during operations. According to their standard practices, the interpreter requests permission to enter a residence, and if so granted, agents enter and secure the premises in order to ensure officer safety. (*Id.*)

After the search and the arrest occurs, if any, and according to policy, the family members are provided a telephone number to call in order to locate the arrested. In addition, arrestees are afforded an opportunity to make a telephone call and to acquire legal services. (*Id.*)

B. The Individual Federal Defendants

The Individual Federal Defendants are Julie Myers, in her prior capacity as the Assistant Secretary for Homeland Security for ICE in Washington, D.C. at all relevant times prior to November 15, 2008; John Torres, Acting Deputy Assistant Secretary for Operations of ICE, and at all relevant times prior to March 5, 2008, the Director (or Acting Director) of the ICE Office of Detention and Removal Operations (DRO) in Washington, D.C.; Scott Weber, Director of the DRO Field Office in Newark, and Bartolome Rodriguez, former Acting Field Office Director for the DRO Field Office in Newark.

Plaintiffs allege that the ORTS program "exponentially increased quotas for the arrest of immigrants" through the use of pre-dawn raids. Plaintiffs allege that the Individual Federal Defendants, despite knowledge of the "unconstitutional and abusive conduct" allowed the ORTS program to continue unabated. More specifically, Plaintiffs maintain that these Individual Federal Defendants should have "develop[ed] meaningful guidelines or oversight mechanisms . . . provide[d]

6

. . . adequate training . . . or otherwise ensured accountability" that ORTS operated within constitutional confines.

Specifically, Plaintiffs allege that

> Despite aggressively increasing the arrest quotas and the number of agents participating in "Operation Return to Sender," and thereafter being notified–via press reports, law suits, and congressional testimony–of the widespread allegations of unconstitutional and abusive conduct by ICE agents as part of this program, the DHS supervisory officials named in this Complaint have continued to foster an institutional culture of lawlessness. Specifically, they have failed to develop meaningful guidelines or oversight mechanisms to ensure that home arrests are conducted within constitutional limits, to provide the agents involved with adequate training (or for some newer agents, any training) on the lawful execution of fugitive operations, or otherwise ensured accountability for the failure to conduct fugitive operations within constitutional limits. On the contrary, on many occasions, DHS supervisory officials have proudly publicized the increasing number of arrests made as a result of the unconstitutional raids that continued to be carried out in the shadows and the dark of the night.

(Second Am. Compl. ¶ 5.)

Plaintiffs allege that Myers and Torres "oversaw the implementation of a five-fold increase in the number of Fugitive Operations Teams in the two-year period between 2005 and 2007." (Second Am. Compl. ¶ 144.)  Additionally, Myers and Torres allegedly "approved a remarkable 800% increase in the arrest quota of each team in the corresponding period of time without providing the necessary training to prevent ICE agents . . . from acting abusively and unlawfully." (*Id.* ¶ 144.) Plaintiffs allege that both Myers and Torres were "repeatedly placed on notice of the routine unconstitutional home-raid practices by ICE agents" through both the media and by law suits

involving themselves.[4]  (*Id.* ¶ 145; ¶143 nn. 6-23.)

Plaintiffs further allege that Myers in responding to these allegations "acknowledged that only five of the 29 individuals arrested were fugitives.  She similarly acknowledged that agents conducting residential searches and arrests routinely do not have judicially-issued warrants, and are therefore required to obtain knowing, voluntary consent before entering a home." (*Id.* ¶ 146.)  Torres allegedly was directly responsible for executing fugitive operations within ORTS. (*Id.* ¶ 147.) Plaintiffs allege that Torres "was specifically notified of unconstitutional home raid practices by officers under his supervision in New Haven, Connecticut."  Plaintiffs allege that "New Haven's mayor called defendant Torres in June 2007 . . . about allegations that defendant Torres's officers 'barged into houses without warrants and verbally abused the people and children were manhandled.'" (*Id.*)  Plaintiffs assert that despite being aware of the unconstitutional practices by ICE agents, Myers and Torres "have not conducted any meaningful investigations into the practice . . . Nor have they, upon information and belief, meaningfully disciplined any officer responsible for such unconstitutional conduct." (*Id.* ¶ 148.)  Finally, Plaintiffs allege that defendants "contributed to such unlawful conduct by continuing to publicize, and laud as 'successful,' their department's dramatic increase in immigration arrests over the past two year." (*Id.*)

Rodriguez and Weber were Directors of the Newark DRO field office during the relevant time period and allegedly "were each directly responsible for overseeing fugitive operations and the execution of [ORTS] in New Jersey," including directing the searches of the residences.  (*Id.* ¶ 149.)

---

[4] Although newspaper articles are generally considered hearsay, see *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 163 n.8 (3d Cir. 2000), in this case the articles show the Individual Federal Defendants had notice of the controversy.  As such, the articles are used during the pleading stage only to show notification.  *See Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 325 (10th Cir. 1989).

Plaintiffs allege that both defendants made "frequent reports and comments on the number of arrests made by ICE agents, and speaks publicly on behalf of ICE about the implementation of [ORTS] in New Jersey."[5]

## III.  QUALIFIED IMMUNITY AND *IQBAL V. ASHCROFT*

This Court previously ruled that it was premature to deny the Individual Federal Defendants' qualified immunity defense.  The Court ordered limited discovery of the Individual Federal Defendants (a deposition and interrogatories to each).

The Individual Federal Defendants submit that the Supreme Court's *Iqbal* decision is a substantial change in law that should alter the Court's earlier qualified immunity analysis. Defendants argue that *Iqbal* made clear that "'because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the officials' own individual actions, has violated the Constitution." (Defs. Reply at 1 (citing *Iqbal,* 129 S.Ct. at 1948).)  Although the Individual Federal Defendants argue that *Iqbal* entirely did away with supervisory liability in civil rights cases under all circumstances, their conclusion is suspect.

The Individual Federal Defendants argue that in *Iqbal* the Supreme Court held that Government officials may not be vicariously liable under a theory of *respondeat superior*, 129 S.Ct. at 1948, and as such there is no liability here.  However, this Court in its previous Opinion, along with many other courts, held that there was no vicarious liability based upon *respondeat superior*

---

[5]  Plaintiffs allege that during one media interview Weber was presented with "specific allegations regarding a pattern of home raids in New Jersey conducted without search warrants and consent, and he responded: 'I don't see it as storming a home . . . .  We see it as trying to locate someone.'"  (*Id.* ¶ 149.)  This is a hearsay statement in a newspaper, which is inadmissible when offered to prove the truth of the matter asserted, but here is used to demonstrate notice to the defendants.  *See Barnes Found.*, 242 F.3d at 163 n.8; *Marsee v. U.S. Tobacco Co.,* 866 F.2d at 325.

under *Bivens*.   Additionally, the Supreme Court made it clear that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue."   *Id.*   In *Iqbal*, the plaintiff brought claims for invidious discrimination in violation of the First and Fifth Amendments, and the Court held that under a discrimination theory the plaintiff "must plead and prove that the defendant acted with discriminatory purpose."  Plaintiffs here do not allege invidious discrimination, but rather violations of their Fourth Amendment rights.[6]   Thus, Plaintiffs' pleadings must be analyzed under the appropriate Fourth Amendment standards.

In the previous Opinion, it made clear that "[i]n order to overcome qualified immunity, a plaintiff must allege facts to show that an individual defendant had personal involvement in the alleged wrongdoing.  Liability cannot be based on the theory of *respondeat superior*."  The Supreme Court in *Iqbal* affirmed this approach to *Bivens* claims.  The Individual Federal Defendants primary contention lies with the Court's determination that "personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."   *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citation omitted).  The Individual Federal Defendants submit that under *Iqbal* there are no situations where "actual knowledge or acquiescence" may sustain a *Bivens* claim for violation of any unconstitutional conduct.  The Court does not agree.  The Supreme Court did not make such a broad pronouncement in *Iqbal*.  The Supreme Court held that

---

[6] One plaintiff alleges a claim under equal protection which is addressed below.

> [a]bsent vicarious liability, each Government official, his or her title nonwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Iqbal*, 129 S.Ct. at 1949.   As is clear from the language above, the Court's focus on "purpose" rather than "knowledge" is significant as it relates to the claim at issue in *Iqbal*.   There plaintiff claimed unconstitutional discrimination, which requires that plaintiff must plead and prove each defendant acted with "discriminatory purpose."   The Fourth Amendment does not require proof of "discriminatory purpose."   Here, Plaintiffs allege that the Individual Federal Defendants had actual knowledge, initiated, and directed their subordinate agents to go beyond the limits of their non-judicial warrants in violation of Plaintiffs' Fourth Amendment rights to be free from illegal searches and seizures.

Further, the Supreme Court in *Iqbal* clarified and affirmed its previous decision with respect to pleading standards in *Twombly*.  *See id.* at 1949 (citing 550 U.S. 544 (2007)).   In both *Iqbal* and *Twombly*, the Court held that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing 550 U.S. at 570).   The *Iqbal* Court did not change the pleading standards as applied by the lower courts.

Moreover, the pleadings in *Iqbal* are distinguishable from the instant facts before this Court. The plaintiff in *Iqbal* alleged that the FBI under the direction of defendant Director Mueller arrested and detained thousands of Arab and Muslim men as part of the investigation into the September 11th attacks.  *See id.* at 1951.   Plaintiff further alleged that along with defendant Ashcroft, former

11

Attorney General of the United States, the two defendants held post-September 11th detainees in "highly restrictive conditions of confinement" and "purposefully" designated plaintiff a detainee of "high interest" because of his race, religion, or national origin. Thus, plaintiff was making conclusory allegations against two of the highest-level officers in the Government for actions taken in the immediate aftermath of the events of September 11th. The Supreme Court further remarked that "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 1951. The Court found it more plausible that the actions of the FBI Director and Attorney General were based upon a "nondiscriminatory intent" and that plaintiff had failed to plead actual discriminatory purpose, as required for a discrimination claim under the First or Fifth Amendment.

It is important to note that the Supreme Court in *Iqbal* distinguished its case from the type of case presently before this Court. While finding that the pleadings were insufficient to overcome qualified immunity, the Supreme Court held:

> It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC. Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September 11th detainees" . . . once they were categorized as "of high interest." To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September 11 detainees as "of high interest" because of their race, religion, or national origin.

"Purposeful discriminatory intent" because of "race, religion, or national origin" is not an element of a Fourth Amendment claim. Here, Plaintiffs' claims for federal officials' violations of

their Fourth Amendment right to be free from unreasonable searches and seizures is an ordinary claim that is properly before this Court.[7]   In this Court's view, *Iqbal* does not hold that a plaintiff to adequately plead a *Bivens* Fourth Amendment claim must allege more than required to show a violation of the fundamental constitutional right alleged.   Several post-*Iqbal* cases have made this important distinction.   *See Chao v. Ballista,* 630 F. Supp. 2d 170, 178 (D. Mass. 2009) ("Notably, the state of mind required to make out a supervisory claim under the Eighth Amendment-i.e., deliberate indifference-requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit against Ashcroft and Mueller."); *Morales v. Grondolsky*, Civ. Action No. 08-2969, 2009 WL 1545841 at *4 (D.N.J. May 29, 2009) ("[T]here is no vicarious liability in *Bivens* actions; 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'")

As noted above, *Iqbal* made clear that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." 129 S.Ct. at 1948.   Thus, the Individual Federal Defendants' assertion that *Iqbal* now stands for the proposition that "knowledge and acquiescence" are insufficient to allege a *Bivens* claim is misplaced.   As the U.S. Supreme Court stated, it will be a contextual analysis and will depend on the constitutional provision at issue.   Therefore, the question before this Court has not changed since the Supreme Court's *Iqbal* decision:   Does Plaintiffs' Second Amended Complaint adequately allege a Fourth Amendment claim against the Individual Federal Defendants?

---

[7]   One Plaintiff, Ontaneda, alleges a claim under the Fifth Amendment based on equal protection of the law.   He alleges that his arrest was effectuated based upon his race and ethnicity.   Plaintiffs concede that *Iqbal* affects this particular claim.   (Pls. Mem. Opp. 9 n.4.) There is no direct evidence of any purposeful discrimination by the Individual Federal Defendants.   Thus, this claim is dismissed.

In *Iqbal*, the Court cautioned that plaintiff was suing the "highest level of the federal law enforcement hierarchy." 129 S.Ct. At 1943. This is not the case here. Additionally, unlike in *Iqbal*, the Individual Federal Defendants were not urgently reacting in the immediate aftermath of a terrorist attack. The alleged acts being challenged occurred pursuant to more aggressive immigration policies undertaken over a two year period. The Individual Federal Defendants in this suit are alleged to have directly initiated the unconstitutional home raid practices at issue. As to Myers and Torres, Plaintiffs allege that they directly implemented the specific ORTS program being challenged in this case (Second Am. Compl. ¶¶ 2-5, 19-20.) Myers and Torres oversaw an 800 % increase in arrests quotas as a direct result of their alleged home raids policies. (*Id.* ¶¶ 30, 144.) Plaintiffs allege that Myers and Torres did nothing to investigate or stop the unlawful practices despite being made aware through lawsuits, congressional inquiries, repeated national media reports and other sources." (*Id.* ¶ 148.) Plaintiffs cite to dozens of articles in national and local newspapers documenting the alleged unlawful ICE immigration raids (*id.* ¶¶ 41, 45, 140, 143) as well as comments by the House Judiciary Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law concerned with the ICE home-raid procedures (*id.* ¶ 46). Further, Plaintiffs allege that the numerous press reports and comments made by the ICE office and Myers directly contributed to the alleged unlawful conduct by lauding as successful the "dramatic increase in immigration arrests." (*Id.* ¶148.) Additionally, Plaintiffs allege that the Mayor of New Haven, Connecticut, directly informed Torres of the unlawful activity of the agents and recommended that ICE discontinue the ongoing home arrest practices. (*Id.* ¶ 147.)

On another note, Julie Myers and John Torres require some further comment because it is necessary to refrain from lawsuits that are not prescribed by Congress, and expending time by such

high-level officials on such issues may undermine national policy.  In *Iqbal* the claim framed before the Supreme Court challenged "the prospect of subjecting high-ranking government officials–entitled to assert the defense of qualified immunity and charged with responding to a national and international security emergency unprecedented in the history of the American Republic–to the burdens of discovery on a basis of a complaint as nonspecific as respondents." 129 S.Ct. at 1945. Here, the facts are different.  The complaint sets forth numerous allegations about the searches, and there is no doubt that Myers and Torres had sufficient knowledge of how the searches were being conducted.  Myers and Torres worked on these issues everyday.  A noted above, this is far different than what was alleged against Ashcroft and Mueller, where there were few, if any, concrete facts alleged.  In addition, since Myers and Torres are two or three position levels below the Secretary of Homeland Security, everyday experience corroborates that they have more knowledge of the practices in the various states.  In this case, Torres and Myers wrote the policy, implemented it, and monitored its progress.  This is a significant difference from the Attorney General and Director of FBI who are concerned about national policy.  Overall the repercussions of Myers and Torres participating in litigation in light of their knowledge is not onerous.

With respect to Rodriguez and Weber, Plaintiffs allege that as directors of the Newark field office they were directly responsible for overseeing the operations and for executing the ORTS mandates in New Jersey. (*Id.* ¶ 149.) Plaintiffs allege that both defendants made specific comments to the media that emboldened alleged unconstitutional practices and that they ignored specific allegations of unlawful activity.  (*Id.*)  As to the Individual Federal Defendants as a group, Plaintiffs allege that they "participated in, directed, or knew of and acquiesced in the violation of plaintiffs' rights; tolerated past or ongoing misbehavior of this kind; or were deliberately indifferent to the risk

that ICE officers, lacking clear training and under the pressure of sharply-increased quotas, would violate the Fourth Amendment rights of individuals . . ." (*Id.* ¶ 157.)

Under *Iqbal*, "a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S.Ct. at 1940. In order to determine whether the complaint sets forth sufficient factual content, the court may not accept "threadbare recitals of a cause of action's elements;" and more importantly, the reviewing court must "draw on its experience and common sense" that the complaint alleges a "context-specific" plausible claim. *Id.* at 1940-41.

Contrary to the argument of the Individual Federal Defendants, there are sufficient factual allegations set forth in the Complaint for the Court, in applying its experience and common sense, to conclude that there is a plausible claim against each Individual Federal Defendant that their personal involvement, direction and knowledge or acquiescence permitted a search of the residence of plaintiffs without consent in violation of the Fourth Amendment.

Generally, the doctrine of qualified immunity shields government officials in their individual capacities from the entirety of the litigation process where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is a twofold test. The first prong is to determine whether their conduct violated clearly established constitutional rights. In this regard, plaintiffs allege there was no consent given to the officers, and the officers entered without permission or possession of an appropriate judicial warrant. In this case, the Individual Federal Defendants "must know about the conduct, and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Williams v. Fort Wayne Police Dept.*, No. 1:08-CV-152 RM, 2009 WL 1616749,

16

at *4 (N.D. Ind. June 9, 2009); *see also Iqbal*, 129 S.Ct. at 1958 (2009) (Souter, J., dissenting) (noting the different tests for supervisory liability).

In this case, the Individual Federal Defendant's knew the officers had no legal warrants that allowed entry into private residences.  The Return to Sender program acknowledged that "warrants of removal do not grant the same authority to enter dwellings as a judicially approved search or arrest warrant."  For certain, the Individual Federal Defendants knew that entry into the residences could only occur with consent by the plaintiffs.  Here, each plaintiff alleges consent was withheld. Moreover, there were numerous newspaper articles giving notice of the brash home entries[8] and a discussion with the Mayor of Hartford about the intrusiveness of the entries.  At the very least, the complaint alleges that each gave a "blind eye" to the issue, and allowed non-consenting searches to be conducted without correction. In short, it is plausible that an allegedly unreasonable search was conducted as set forth in the Complaint.

Secondly, the constitutional right violated must be one of which a reasonable person would have known.  Clearly, the high-level Individual Federal Defendants knew that a search was only allowed with consent, and the agents intrusive entry in early morning hours with officers screaming at plaintiffs did not allow for the clear-thinking consent as required under the Fourth Amendment. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248 (1973) (holding that the Fourth Amendment requires  that the government "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances . . . .").

---

[8]  Based upon my government experience and common sense, each Individual Federal Defendant most likely received and read news clips regularly, including those cited in the Complaint.

Accepting as true the allegations set forth in the Second Amended Complaint, the Court finds the allegations sufficient at this stage "to state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. 1949 (citing *Twombly*, 550 U.S. at 570).   Plaintiffs have alleged sufficient facts demonstrating that the Individual Federal Defendants "set in motion a series of events" that resulted in the deprivation of Plaintiffs' Fourth Amendment rights.  *Padilla v. Yoo*, 633 F.Supp.2d 1005, 1036, (N.D. Cal. 2009).   In *Padilla,* the plaintiff alleged that Yoo had helped created the legal policies that led to violations of his constitutional rights.  In denying Yoo's request for qualified immunity, the Court compared the facts to *Iqbal*, where the Supreme Court "rejected that 'bare assertions' in a complaint that high-ranking government officials knew about unconstitutional treatment and therefore caused it are not entitled to 'the assumption of truth.'" *Id.*  In *Padilla*, the court held that Padilla "alleges with specificity that Yoo was involved in the decision to detain him and created a legal construct designed to justify the use of interrogation methods that Padilla alleges were unlawful."  *Id.*  The *Padilla* Court held that "federal officials were cognizant of the basic fundamental civil rights afforded to detainees under the United States Constitution" and because the legal rights were not in doubt, the federal officials' alleged knowledge and involvement in directing the policy were sufficient to overcome qualified immunity at the pleading stage.  *Id.* at 1037.  The Court finds this particularly instructive.  Similarly, there are no novel legal issues here.  Plaintiffs allege that the Individual Federal Defendants and their subordinates, armed with only administrative warrants in hand that did not authorize entry without consent, violated plaintiffs' rights to be safe from unreasonable searches and seizures under the Fourth Amendment.  This is an ordinary, well-protected, and significant legal right under our Constitution, and is appropriately brought before this Court.

**IV.  CONCLUSION**

The Individual Federal Defendants' Motion to Dismiss the Second Amended Complaint based upon qualified immunity is denied except with respect to plaintiff Ontaneda's equal protection claim which is dismissed.

In conclusion, the motion for dismissal based upon qualified immunity is denied without prejudice.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

January 27, 2010